IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BETTIE SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-0651 |
| | § | |
| ALLSTATE INSURANCE, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

In September 2005, this court stayed this case pending the Texas Supreme Court's answer to a question certified by the United States Court of Appeals for the Fifth Circuit. On August 31, 2006, the Texas Supreme Court answered this certified question in *Fiess v. State Farm*, 202 S.W.3d 744 (Tex. 2006). This case was then reopened and the parties submitted statements on the application of the *Fiess* opinion. Allstate had previously moved for summary judgment on all claims, and Smith had responded. After considering the parties' submissions and the impact of the *Fiess* opinion, this court finds that the motion, response, and submissions fully address the issues in this case and that Allstate is entitled to summary judgment. The reasons for this decision are set out below.

**I.      Background**

The facts of this case have been described in detail in this court's earlier opinion. (Docket Entry No. 36). Briefly, Bettie Smith's home suffered water damage as a result of a tropical storm that flooded much of Houston, Texas on June 9, 2001. Smith alleged that

the storm's flood waters did not enter her home, but that her toilets overflowed. Allstate disputed this contention. Smith filed several insurance claims under her Allstate homeowner's policy following the storm. Her homeowner's policy covered damage caused by water flowing from a plumbing or air conditioning leak but did not cover damage caused by flooding from external water that enters the home. The policy did not cover loss caused by "rust, rot, mold or other fungi." (Docket Entry No. 10, Ex. 1).

Smith filed her initial claim for damages on June 10, 2001. Michael McNally, a claims adjustor from a company that Allstate hired to help with the high volume of claims after the storm, initially inspected Smith's home on June 18, 2001. McNally noticed a crack in the bathroom tile during his inspection. He was told that this crack was caused by a plumbing leak under Smith's home. McNally reported this to his supervisor. McNally also saw extensive damage to the hardwood floor inside the home and a water mark eight inches off the ground on the outside of the home. McNally interviewed neighbors, who said their toilets had not overflowed but that their homes had flooded from the heavy rainfall. McNally and Allstate concluded that at least some of the damage to Smith's home was caused by flood waters. McNally was told to close the claim filed on June 10, 2001 and open a new claim with an earlier date of loss.

Smith filed a claim with the Federal Emergency Management Agency ("FEMA") in mid-June 2001. FEMA inspected Smith's home on June 26, 2001 and issued a report concluding that Smith's home was damaged by eight inches of flood water. The FEMA report listed flood water as the cause of damage in all areas of Smith's home except for the

kitchen, which listed "sewer backup" as the cause. (Docket Entry No. 27, Ex. J). FEMA paid Smith $4,788.91 for repair of the flood damage.

On June 27, 2001, Smith called Allstate to ask about the status of her claim. Allstate opened a new claim for "foundation and sewage backup damage," listing June 9, 2001 as the date of loss. The claims adjustor for this claim was Peter Hura. Hura initially thought that the claim would be transferred to another adjustor because it was a claim for damages caused by the tropical storm and Allstate had contracted the large amount of claims-adjustment work for these claims to another company. Hura went on vacation shortly after opening the case. On July 10, 2001, after his return from vacation, Hura learned that this claim had not been transferred and tried to contact Smith by telephone on July 10 and 11, 2001. On July 11, 2001, Hura sent Smith a "contact" letter and again tried to call her on July 17, 2001. That same day, Hura sent Smith another letter stating that her claim would be closed temporarily and listing a toll-free number for the Allstate National Catastrophe Center. (Docket Entry No. 31, Ex. N).

Allstate opened another claim for Smith on June 27, 2001 for the crack in the foundation. Claim 445 was opened with a reported loss date of April 9, 2001. Allstate sent a plumbing specialist to investigate this claim on July 3, 2001. The investigation uncovered a leak in the drain pipe underneath the bathtub and found water and mold damage in that area. Smith sought coverage for this mold damage and asked for additional living expenses to allow her to move out of her home until the repairs had been made.

On July 13, 2001, Allstate transferred claim 445 to an adjustor specializing in mold claims. A mold-remediation specialist hired by Allstate inspected Smith's mold claim on July 16, 2001. Allstate told Smith on July 25, 2001 that it was denying her claim for mold contamination, but that if any evidence showed that the mold resulted from a covered event rather than from flood, the claim could be reopened for further review. Allstate stated that the leak in the drain pipe did not cause the sewer backup and that Allstate had denied Smith's previous claim under the flood exclusion.

On August 15, 2001, Patti Brown, an Allstate manager, discussed the claim with Smith's son-in-law, Jim Crawley, who was also an insurance claims adjustor. Brown told Crawley that Smith's plumbing leak and related foundation damage claims were covered. Brown authorized payment for the losses caused by the plumbing leak. Allstate paid Smith $24,956 to repair the plumbing leak and related foundation damage on August 16, 2001. On September 20, 2001, the mold specialists issued the analysis on the mold found underneath the bathtub. The analysis stated that the mold may have been caused by the burst pipe and exacerbated by the flood waters during the tropical storm, but it was impossible to determine how much mold was caused by which event.

Allstate told Crawley on September 26, 2001 that it would cover only mold damage resulting from the plumbing leak, which Allstate believed it had already done by its August 16, 2001 payment. On October 23, 2001, Crawley's wife filed a complaint with the Texas Department of Insurance stating that Smith's June 2001 claim had yet to be paid. Allstate responded on November 19, 2001, stating that its August 16, 2001 payment covered the

4

damage from the plumbing leak and that it was still processing the claim for additional payment for mold contamination.

   While Smith was tearing out the carpet and baseboards in her home after the flood, she noticed mold growing behind several of the baseboards. The mold was growing beneath windows that had once held portable window air-conditioning units. Smith had removed the air-conditioning units from her home sometime before 2000, when she installed a central heating and cooling system in the house. On July 6, 2001, Smith filed three mold-contamination claims for damage to the walls behind the baseboards caused by the leaking air conditioners. (Docket Entry No. 31, Ex. M). Allstate promptly denied these claims, stating that they were not filed timely.

   Over the ensuing months, Smith and Allstate continued to dispute coverage of the mold-contamination claims. In March 2002, Crawley's wife hired a mold-remediation specialist to conduct a second mold inspection of Smith's home. That investigation revealed several types of mold. On March 8, 2002, Allstate paid Smith $6,878.08 for mold remediation in the bathroom area affected by the plumbing leak. On March 21, 2002, Allstate paid Smith an additional $1,548.83 to repair a crack in the bathroom tile caused by that leak.

   Allstate paid Smith a total of $36,089.73 for losses caused by the plumbing leak. Allstate denied the remainder of Smith's claims for mold damage, attributing those losses to the tropical storm flood waters and the window air-conditioning units. Allstate claimed that during its investigation, Smith told two of its adjustors that flood waters had entered her

home the night of the storm. It also stated that Smith's claim with FEMA indicated that she suffered damage caused by the flood waters. Allstate argued that it denied Smith's mold claims because it could not differentiate the mold caused by flood waters from the mold caused by overflowing toilets. Smith denied making the statements to the Allstate adjustors and argued that the only water in her house the night of the tropical storm was from overflowing toilets. Smith argued that Allstate wrongfully denied coverage for mold contamination caused by the overflowing toilets on June 9, 2001 and the mold behind the baseboards caused by the air-conditioner leaks.

Smith filed this lawsuit in Texas state court and Allstate removed the case to this court on February 20, 2003. (Docket Entry No. 1). Allstate moved for summary judgment on April 16, 2004, which this court denied on March 27, 2005. (Docket Entry No. 36). This court concluded that disputed fact issues existed as to (1) the source of the water responsible for flooding Smith's home and (2) whether different mold types found in Smith's home were caused by water leaks that occurred before tropical storm Allison. After a status conference in September 2005, this court stayed the case pending a decision from the Texas Supreme Court in the *Fiess* case. After that opinion issued, this court reopened this case to determine *Fiess*'s application to this suit.

**II.     Analysis**

In *Fiess*, the Texas Supreme Court addressed the following question:

> Does the ensuing loss provision contained in Section I-
> Exclusions, part 1(f) of the Homeowners Form B (HO-B)
> insurance policy as prescribed by the Texas Department of

> Insurance effective July 8, 1992 (Revised January 1, 1996), when read in conjunction with the remainder of the policy, provide coverage for mold contamination caused by water damage that is otherwise covered by the policy?

*Fiess*, 202 S.W.3d at 746.  The exclusion provision's section 1(f) of the Texas HO-B insurance policy states that "[w]e do not cover loss caused by . . . rust, rot, mold or other fungi."  The dispute centered around that provision's final line:  "We do cover loss caused by collapse of the building or any part of the building, *water damage*, or breakage of glass which is part of the building if the loss would otherwise be covered under this policy."  *Id.* (emphasis added).  The Fifth Circuit's certified question asked whether mold was a loss caused by water damage and covered by the policy, or if all types of mold were excluded regardless of the cause.  The Texas Supreme Court answered that mold was not covered.  It reasoned that the plain language of the exclusion provision was clear that it did not cover loss caused by mold regardless of whether the mold grew from a steady water leak or from water damage due to a catastrophic event.  Reading the policy any other way would have the deleterious effect of converting the policy "from an insurance policy into a maintenance agreement."  *Id.* at 750.

The *Fiess* opinion made it clear that Smith's claims for breach of contract due to Allstate's refusal to provide coverage for mold damage are no longer viable under Texas law.  This court stated in its March 27, 2005 Memorandum and Opinion that the origination of the water that caused the mold damage was a disputed fact issue, as was the issue of whether certain molds occurred before the tropical storm.  These issues are no longer material to the

breach of contract claims in this case. It does not matter whether the water that caused the mold came from flood waters during the tropical storm or from a sewage backup. Under *Fiess*, mold damage is not covered under the Texas HO-B insurance policy. Summary judgment is granted as to Smith's breach of contract claims.

Summary judgment as to Smith's extracontractual claim under article 21.55 of the Texas Insurance Code is also warranted as a matter of law.[1] That statute states that damages are to be awarded if the insurer is liable "pursuant to a policy of insurance." TEX. INS. CODE § 21.55; *see also Progressive County Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005) ("There can be no liability under article 21.55 if the insurance claim is not covered by the policy."). Allstate has no liability under its insurance policy for mold damage to Smith's home; Allstate cannot be liable to Smith under article 21.55.

Smith asserted that her extracontractual claims for bad faith and for violation of article 21.21 of the Insurance Code remain. Texas insurance law generally conditions recovery for bad faith and extracontractual claims on a recovery for breach of the insurance contract itself. *See Boyd*, 177 S.W.3d at 922; *Liberty Nat'l Fire Ins. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996) (no bad-faith liability because the insurance policy did not provide coverage and the plaintiff did not plead additional damages unrelated to the denial of coverage); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995) (same). A bad-faith claim may survive a no-

---

[1] Effective April 2005, the Texas legislature recodified the Texas Insurance Code as part of its ongoing statutory revision program. TEX. INS. CODE § 30.001(a). The changes did not affect the statute's substance, but made the Code's provisions more accessible and understandable. TEX. INS. CODE § 30.001(b). Smith filed this lawsuit in January 2003. Because she filed her suit before the renumbering occurred, all references to the Insurance Code are to the old provisions.

coverage finding if the insurer's conduct was extreme and produced damages unrelated to and independent of the policy claim. *Am. Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 804 (Tex. 2001); *Stoker*, 903 S.W.2d at 341. Texas law provides that an insurer has a duty to deal fairly and in good faith with its insured in processing and paying claims. *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). "This duty of good faith and fair dealing arises out of the special trust relationship between the insured and the insurer." *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 212 (Tex. 1988). A plaintiff establishes a breach of this duty by showing (1) an absence of a reasonable basis for denying or delaying payment of benefits under the policy and (2) that the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim. *Id.* at 213. "The first element of this test requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits." *Id.* The second element balances the insurer's right to reject an invalid claim and the duty to investigate and pay compensable claims. *Id.* "This element will be met by establishing that the carrier actually knew there was no reasonable basis to deny the claim or delay payment, or by establishing that the carrier, based on its duty to investigate, should have known that there was no reasonable basis for denial or delay." *Id.* The insurer has a duty to "investigate claims thoroughly and in good faith, and to deny those claims only after an investigation reveals there is a reasonable basis to do so." *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990). The insured must prove that there were no facts before the insurer that, if believed, would justify denial of the claim. *State Farm Lloyds Inc. v.*

y
z

*Polasek*, 847 S.W.2d 279, 284 (Tex. App.—San Antonio 1992, writ denied). This test assures that a carrier "'will not be subject to liability for an erroneous denial of a claim' as long as a reasonable basis for denial of the claim exists." *Stoker*, 903 S.W.2d at 340 (quoting *Aranda*, 748 S.W.2d at 213). "As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith." *Lyons v. Millers Casualty Insurance Co.*, 866 S.W.2d 597, 600 (Tex. 1993).

Allstate denied Smith's mold-contamination claims before *Fiess* resolved the uncertain status of mold-damage coverage under the Texas HO-B policy. Allstate determined that it could not identify which molds were caused by a covered loss, the plumbing leak, and which were caused by tropical storm flood waters, which are not covered by the Texas HO-B policy. Smith argues that Allstate failed to make a reasonable investigation of her sewer-backup claim. (Docket Entry No. 31 at 50–51). According to Smith, Michael McNally, the adjustor sent to investigate Smith's claims, made the finding that flood waters caused the damage without adequate investigation or facts to support his conclusion. Smith also points to the testimony of Jim Crawley, her son-in-law (and claims adjustor), who helped her deal with Allstate's adjustors and agents. (Docket Entry No. 31 at 47). Crawley testified that he "explained to [McNally] that the sewer backup had occurred. He immediately went to try and, you know, deny—act as if it was a flood claim that had been filed." (Docket Entry No. 31, Ex. D at 36). Crawley testified that the delay in processing Smith's claim allowed "sewer bacterial water to spread throughout her entire

house, and the longer it stayed, the worse it had gotten." (*Id.* at 37). Smith claims that this conduct caused her to incur additional living expenses, mental anguish, and loss of enjoyment of her home. (Docket Entry No. 1, Ex. A, ¶¶ 11, 14, 17).

The undisputed evidence in the record shows that McNally investigated Smith's home, observing a water line eight inches in height on the outside walls and damage to hardwood floors, both of which indicated that at least some of the damage was due to external flood waters. McNally talked with Smith's neighbors, who stated that the storm's flood waters had filled their homes the night of June 9, 2001, but that their toilets had not backed up. Allstate also learned that Smith filed a claim with FEMA for flood damage and accepted nearly $5,000 from that agency for damages caused by the storm. Allstate's mold specialist was unable to determine the causes of molds in Smith's home. As for the mold found behind the baseboards below the air-conditioning units, Allstate had a reasonable basis for denying the claims: it determined that Smith had not timely filed her claim for this damage. Allstate reasonably took the position that the Texas HO-B policy did not cover damage caused by flood waters or mold. Smith has failed to raise a fact issue as to whether Allstate unreasonably denied her claim for mold losses.

Nor has Smith raised a fact issue as to whether Allstate's delay in paying for what Allstate ultimately concluded were covered losses was unreasonable. Smith filed several claims for water damage to her house. From the beginning of the claims-investigation process, it was unclear where the water came from or when the damage had occurred. Within one month of the tropical storm, Allstate assigned a mold investigator to determine

11

the cause of the mold in Smith's home. That specialist issued his findings two months later, unable to differentiate between mold caused by the burst pipe and mold caused by flood waters. Allstate continued to investigate the claim. In March 2002, Allstate paid Smith $6,878.08 for mold remediation in a bathroom area affected by the plumbing leak, concluding that the remainder of the damage was caused by flood waters. As for the claim for other damages, Allstate paid Smith $24,956 to repair damage from a plumbing leak and related foundation damage, and on March 21, 2002, paid an additional $1,548.83 to repair a crack in the bathroom tile caused by that plumbing leak. As a matter of law, there is no basis on which a reasonable jury could find bad faith in the denial of uncovered claims or in the delay in paying covered claims.

### III.     Conclusion

Smith's contractual claims for mold damage are dismissed based on the Texas Supreme Court's holding in *Fiess v. State Farm*, 202 S.W.3d 744 (Tex. 2006). Smith's extracontractual claims, based on articles 21.55 and 21.21 of the Texas Insurance Code and bad faith, are also dismissed. Final judgment will be entered by separate order.

SIGNED on February 27, 2007, at Houston, Texas.

                                       Lee H. Rosenthal
                                  United States District Judge